S. Livingston Mather, Testamentary Trust u/w of Samuel Mather, Deceased, William G. Mather and S. Livingston Mather, Trustees v. Commissioner.
Mather v. Commissioner
Docket Nos. 789, 790.
United States Tax Court
1944 Tax Ct. Memo LEXIS 175; 3 T.C.M. (CCH) 729; T.C.M. (RIA) 44237; July 20, 1944
*175 Petitioners were residuary legatees. The testator had executed a note jointly with and as an accommodation to another. The note was allowed as a claim against testator's estate which was thereafter distributed in kind subject to estate liabilities. The accommodated party was insolvent at the date of testator's death and has been so ever since. Petitioners made payments on the joint note in 1939. Held, that petitioners are not entitled to bad debt deductions under Section 23 (k) of the Internal Revenue Code. J. B. Putnam, Esq., and Edwin A. Howe, Esq., 1882 Union Commerce Bldg., Cleveland, O., for petitioners. T. F. Callahan, Esq., for respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: This is a consolidated proceeding involving 1939 income tax deficiencies determined against S. Livingston Mather and the trustees under a testamentary trust created under the will of Samuel Mather, deceased, for the benefit of Katherine Mather McLean in the respective amounts of $99,288.35 and $6,466.67. The sole and common question presented for decision is whether petitioners are entitled to a bad debt deduction under the provisions of Section 23 (k) of the Internal Revenue *176 Code. Two other issues raised by the pleadings in Docket No. 789 have been settled by stipulations and effect will be given thereto in the recomputation under Rule 50. Other adjustments made by respondent are not contested. Petitioners filed their income tax returns for 1939 on the cash receipts and disbursements basis with the collector for the 18th District of Ohio. The proceeding was submitted upon stipulations of fact incorporating therein several exhibits. At the hearing petitioners objected to the admission of paragraphs 7, 8 and 9 and exhibits B, C, D, E, F, H, and I of the stipulation on the ground of immateriality. Ruling on the objection then being reserved, it is now overruled. The stipulations in their entirety are adopted herewith by reference, but we shall include in this report a summary of only so much thereof as is necessary to an understanding of the issues and our opinion. Findings of Fact Petitioners were residuary legatees under the will of Samuel Mather who died testate on October 18, 1931, a resident of Cuyahoga County, Ohio. Prior to June 1, 1931, Robert H. Bishop, Jr., the husband of Mather's daughter, Constance, had become financially involved. Mather *177 loaned Bishop securities which the latter pledged with a brokerage firm as security for his account there. Still the account was short and the brokerage firm threatened to liquidate the collateral. To protect his securities so pledged by Bishop and to provide Bishop with funds to meet his various obligations, Mather arranged a loan at The Guardian Trust Company, of Cleveland, Ohio, in the sum of $3,566,000. The loan was evidenced by a joint and several promissory note executed and delivered by Mather and Bishop, dated June 1, 1931, due one year from date and secured by collateral having a market value of approximately $4,650,000. Of the securities so pledged, $500,000 worth belonged to Bishop, $1,750,000 worth belonged to his wife and $2,400,000 worth belonged to Mather. The proceeds of the loan, plus $130.24 in cash furnished by Bishop, were disbursed by the bank in payment of Bishop's debts including that in favor of the brokerage firm. The securities owned by Mather which were pledged to it were surrendered and became a part of the collateral provided by Mather to secure the joint note. Mather did not make a gift to Bishop as a consequence of the above described transaction. No *178 payment having been made on the principal of the joint note prior to Mather's death, a claim was filed and allowed against the Mather estate in the face amount of the note. Bishop, at the time of Mather's death, was insolvent and wholly unable to pay any amount on any unsecured obligation owed by him and he has been so ever since. The executors of the Mather estate and the Commissioner engaged in a controversy over the amount of the Federal Estate Tax due. As finally settled, the estate was allowed as a deduction in computing the value of the net estate the amount of the joint note plus interest accrued to the date of death less the value of the pledged securities belonging to Bishop and his wife, or $2,281,944.23. In order to provide time for the ultimate payment of obligations of the estate and thus avoid a disastrous liquidation and to provide for the distribution of assets to the legatees under Mather's will, a corporation, Samuel Mather Estate, Inc., was created and a contract was executed by the interested parties on November 13, 1933 calling for the acquisition of the estate's assets by the corporation subject to all debts and liabilities of the estate in the order of their *179 priority in exchange for stock. The corporation agreed to issue jointly with Bishop Series A collateral trust notes in an aggregate principal amount equal to the balance due on the joint note plus interest to December 31, 1934. It also agreed to issue Series B collateral trust notes in an amount sufficient to settle the unsecured obligations of the estate. Both series of notes were to be issued pursuant to a trust indenture. The corporation's assets were to be deposited and pledged with the trustee under the trust indenture as security for the payment of the notes. This contract was approved by the Probate Court of Cuyahoga County, Ohio, and its terms thereupon were carried out. The executors of Mather's estate duly transferred to the corporation all the property and assets of the estate in a tax-free exchange whereby they received 11,465 shares of the corporations's Class A preferred stock, 4,000 shares of its Class B preferred stock, 4,000 shares of its Class C preferred stock and 1,000 shares of its common stock. The Class B preferred stock was distributed in a way not here material. The Class A preferred, the Class C preferred and the common stock were distributed to the various *180 legatee under Mather's will in proportion to their interests in the estate. Class A preferred was distributed to specific legatees and Class C preferred and common stock was distributed to the residuary legatees including the petitioners herein. Petitioner in Docket No. 789 received 1,000 shares of Class C preferred and 250 shares of the common. Petitioners in Docket No. 790 received 250 shares of Class C preferred and 62 1/2 shares of the common. The corporation assumed the payment of the debts, obligations and liabilities of the Mather estate including its obligation on the joint note. Among the assets of the estate so transferred to the corporation were the securities which had been pledged as security for payment of the joint note. They were transferred subject to such lien. The Series A notes, due December 31, 1939, were delivered to the holders of the joint note in the way of additional evidence of the indebtedness, the holders of the joint note thereby agreeing to make no demand for payment of the joint note unless the Series A notes fell into default. The Series B notes, also due December 31, 1939, were delivered to the unsecured creditors of the estate and accepted in full *181 payment of their respective claims. Coincident with the transfer of the estate assets to the corporation, an agreement was made by and between the executors of the estate, the corporation, Bishop and Constance wherein Bishop acknowledged and agreed that the joint note had been executed by Mather as an accommodation to him; that he was indebted to the executors for the interest and principal which they had paid on the joint note; and that he would thereafter be indebted to the corporation in this sum plus all further payments which the corporation would make on the joint note and the Series A notes to be issued by it and Bishop jointly. The executors, by the same instrument, assigned their claim against Bishop to the corporation. Constance agreed that the securities belonging to her and pledged to secure the joint note might be applied toward payment of the joint note. In December, 1938, a plan of complete liquidation of the corporation was adopted and effectuated to have the benefit of the provisions of Section 112 (b) (7) of the Revenue Act of 1938. As a consequence, the petitioners received their pro rata share of the assets of the corporation in kind, subject to all existing *182 liens thereon, in complete cancellation and redemption of their stock in the corporation. In accordance with the plan petitioners, as well as the other common stockholders of the corporation, agreed to assume the payment of the corporation's debts in proportion to their common stock holdings, but only out of the assets transferred to them in exchange for their common stock or any other property into which such assets might be converted. Thus petitioners in Docket No. 789 and No. 790 assumed the payment of 1/4 and 1/16 of each debt, respectively. Among such debts was the unpaid balance due on the joint note in the sum of $1,403,715.22. The collateral owned by Constance was sold and applied in reduction of the balance due. During the taxable year petitioners in Docket Nos. 789 and 790 paid, respectively, $120,145.35 and $48,898.98 on the joint note. The fair market value of the properties received by the petitioners upon the liquidation of the corporation was many times greater than the portion of the indebtedness on the joint note which they assumed and agreed to pay and was in excess of the fair market value of their share of the Mather estate as of the date of Mather's death. The *183 aggregate value of the securities distributed by the corporation to the stockholders less the debts assumed by the latter exceeded the net estate of Mather upon which was based the Federal Estate Tax. Opinion Petitioners in Docket Nos. 789 and 790 claim the right to 1939 bad debt deductions in the respective amounts of $120,145.35 and $48,898.98, representing payments made by them on a joint note of Samuel Mather, deceased, the indebtedness upon which was assumed in conjunction with the receipt of residuary bequests under Mather's will. The deductions so claimed under Section 23 (k) of the Internal Revenue Code were rejected by respondent. Hence, this proceeding. Petitioners take the position that Mather was simply an accommodation maker of the joint note; that the accommodated party was Robert H. Bishop, Jr., the other maker; that Mather, although primarily liable on the note, had an inchoate right to recover from Bishop any amount which he might be required to pay; that they (petitioners) succeeded to such inchoate right of reimbursement; that the right was brought to fruition by the payments made by them in 1939; and, Bishop then being insolvent, that they then became entitled *184 to a bad debt deduction under the rationale of Shiman v. Commissioner, 60 Fed. (2d) 65 and other cases in its line. Respondent denies that Mather was an accommodation maker of the joint note. On the contrary, he contends that here was a loan by the bank to Mather and a second loan by Mather to Bishop giving rise to a debtor-creditor relationship between the two men as of that time, 1931, and that the debt became worthless long before 1939. Respondent also urges that the same worthless debt may not be deducted in computing the value of the net estate for Federal estate tax purposes and again by legatees who chose to take their bequests in kind subject to estate liabilities. While we are not in entire accord with the reasons advanced by respondent in support of his position, we do think that he properly disallowed the asserted deductions. The decisive point here is not the legal relationship which arose as between Mather and Bishop by virtue of their execution and delivery of the joint note and the circumstances surrounding such transaction. It may be assumed, as petitioners contend, that Bishop was accomodated by Mather and that the latter had a right *185 over against Bishop immediately upon, but not until, his response under the note. However, it does not follow thereby that petitioners stand in the place and stead of Mather. This is the link in petitioners' chain of propositions which disintegrates under scrutiny and with it petitioner's conclusion, as we will hereinafter point out. In spite of the rather elaborate and unusual method adopted and carried out in connection with the payment of Mather's debts and the distribution of his estate, petitioners can claim no different position than that of residuary legatees of such estate. Their acquisition of stock in Samuel Mather Estate, Inc., came as a direct consequence and in representation of the interests bequeathed them in Mather's will. Accordingly, it is necessary only to understand the posture of a residuary legatee in relation to his testator and the latter's estate in order to ascertain the interests, rights and liabilities which inhered in petitioners as a result of Mather's death. Petitioners' conclusion presupposes that their status was analogous to that of an assignee, succeeding to the rights of his assignor and subjected to his liabilities. But this is an erroneous hypothesis. *186 The interests devolving to a residuary legatee are not at all comparable to those obtained by an assignee. Such interests include merely the right to a portion of the residue of the testator's estate after the payment of all charges imposed by law and by the testator in the way of specific bequests and annuities. Young Men's Christian Ass'n. v. Davis, (Ohio, 1922) 140 N.E. 114. Among the charges imposed by law are the debts of the testator to which his whole estate is made liable under Ohio statute, applicable here. Page's Ohio General Code Annotated Sec. 10504-77. The duty to discharge the testator's debts rests with the executor of his estate. Page's Ohio General Code Annoted, Sec. 10509-121. Hence, had Mather's estate been administered in the customary manner it is clear that petitioners would have made no payments to the payee of Mather's note, for the indebtedness would have been discharged before any rights in Mather's estate ripened in petitioners' behalf and, perforce, before the receipt of their distributive shares. They would have received their bequests free of the debts and liabilities of Mather and his estate. Having paid nothing *187 on the note there would be no basis upon which petitioners could claim a bad debt deduction from income and the instant question would not have arisen. True, in this case the Mather estate was not administered in the customary manner, for debts were not discharged before it was closed and its assets distributed. Rather, as a result of a series of plans, agreements and transactions, petitioners acquired their pro rata share of the estate's assets in kind subject to existing charges, among them being the balance of the indebtedness on the joint note which petitioners assumed proportionately. In other words, rather than taking their testator's net estate, all Mather's residuary legatees, including these petitioners, agreed to take his gross estate less specific bequests and assume payment of the liabilities which otherwise would have been discharged by the executors out of the estate's assets. That this is the sum and substance of the whole procedure is demonstrated by the fact that the legatees accepted no personal liability for the payment of Mather's debts, including his indebtedness on the joint note, but agreed only to pay, and did pay them out of the assets respectively transferred *188 to them. In these circumstances may petitioners have a bad debt deduction to which they otherwise could not have become entitled? We think not. In Wright v. Commissioner, 50 Fed. (2d) 727 it was said, "And the Government cannot, of necessity, in the collection of its taxes, be left to the mercy of agreements between individuals." And in Hamlen v. Welch, 116 Fed. (2d) 413 the court stated, "It has been held that where a taxpayer attempts to deduct as bad debts amounts which he has paid as endorser or guarantor and for which he has not been reimbursed, it must be shown that he was legally bound to pay as the voluntary assumption of obligations does not justify deductions. Jamie A. Bennett, 1939, 40 B.T.A. 745; Cf. Robinson v. Commissioner, 8 Cir. 1931, 53 Fed. (2d) 810, 79 A.L.R. 975". The pertinency of the above quotations to the instant situation is patent. Petitioners were neither makers, endorsers nor guarantors of the joint note upon which they made payments. Prior to the assumption of the liability which the note evidenced, the payee had *189 no recourse as against petitioners; and even thereafter it could subject only the assets received from the Mather estate, through the corporation, to the satisfaction of the note. Moreover, as indicated above, it was petitioners' privilege to take their bequests freed of the obligations of Mather. That they did not so take them was due to their voluntary acquiescence and participation in a plan calculated to benefit themselves and which, in fact, was successful in its purpose. (The assets which petitioners eventually received, less the indebtedness assumed, were of greater value than their respective shares of Mather's net estate at the date of his death). Moreover, when payment of the note was assumed, as aforesaid. petitioners knew or should have known that Bishop. the joint maker and accommodated party, was insolvent and that any right to reimbursement which the law might imply was then worthless. Hence, we have here a case where by agreement the petitioners voluntarily assumed the payment of obligations at a time when they knew they could not recover for the outlay then required. A bad debt deduction can not be allowed under such circumstances. Petitioners argue that the executors *190 of Mather's estate would have been entitled to a bad debt deduction had they paid the joint note, Bishop being insolvent, and therefore it is only equitable that they be given the same consideration. Regardless of what the executors could or could not have done, this argument is fully answered above. However, we think it appropriate to point out that this argument, in truth, must work the other way and furnishes an additional reason for the conclusion which we have reached. The rights of petitioners as residuary legatees certainly can rise no higher than those of the executors whose duty to discharge the testator's debts they assumed. And the executors, contrary to petitioners' premise. would not have been entitled to a deduction in computing net income of the estate upon their satisfaction of the joint note. In Estate of Jacob S. Hoffman, 36 B.T.A. 972. it appeared that the decedent and another were co-guarantors on a debt which the other guarantor paid before the decedent's death. Thereafter, the executor paid decedent's contributory share of the debt. The obligation of the primary obligor was worthless. In denying to the executor a right to deduct *191 the payment from income for income tax purposes we held that debts owed by the estate at the time of death had no effect upon the income of the estate when they were later paid, although they might have been deductible by the decedent had he paid them. We there stated that the taxpayer took the estate of the decedent encumbered with the particular obligation and that it thus suffered no loss in discharging it. See also John M. Brown, Executor, 11 B.T.A. 1203; Roy J. O'Neil. et al. Administrators, 31 B.T.A. 727; Herbert G. Perry et al., Executors, 32 B.T.A. 513. Likewise in the present case the indebtedness on the joint note was a primary obligation of Mather at the time of his death and, hence, of his executors. Therefore, they could not have deducted it from income for a taxable period following Mather's death had they and not petitioners paid it. Rather, the amount of the obligation, less the value of the collateral posted by Bishop and his wife and the right over against Bishop (which was worthless) were deductible in computing the net estate for Federal estate tax purposes. Commissioner v. Wragg, 141 Fed. (2d) 638; *192 Florence O. R. Lang et al., Executors, 32 B.T.A. 527. See also Florence O. R. Lang et al., Executors, 32 B.T.A. 522. The estate here had the benefit of this deduction. Since the executors could not have deducted payments made by them on the joint note of the decedent from estate income, it follows that petitioners are equally prevented from taking deductions from their income for payments made on the same obligation. Robert J. Kleberg, et al., Executors, 31 B.T.A. 95, heavily relied upon by petitioners, is not in conflict with our conclusion. There the deduction allowed constituted ordinary and necessary expenses of the estate incurred in connection with the earning of income following the death of the decedent. Other cases in its line are similarly distinguishable. The respondent's disallowance of the claimed bad debt deductions is sustained. Because of uncontested adjustments and the disposition of other issues by agreement, as hereinbefore stated. Decision will be entered under Rule 50.